

## The University of the State of New York

**The State Education Department**
State Review Officer
www.sro.nysed.gov

No. 24-318

**Application of a STUDENT WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**
Law Offices of Regina Skyer and Assoc., LLP, attorneys for petitioners, by Jaime Chlupsa, Esq.

Liz Vladeck, General Counsel, attorneys for respondent, by Irene Dimoh, Esq.

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioners (the parents) appeal from a decision of an impartial hearing officer (IHO) which found that respondent (the district) offered their daughter appropriate educational programming and denied their request for reimbursement of their daughter's tuition costs at The Windward School (Windward) for the 2023-24 school year. The appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]).  First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]).  An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]).  The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]).  A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]).  The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]).  The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4).  The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5).  The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]).  The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

**III. Facts and Procedural History**

The student previously attended a district public school for first grade (2021-22 school year) and second grade (2022-23 school year), during which time she was a general education student in class where integrated co-teaching (ICT) services were delivered (Parent Ex. N ¶¶ 4-5; see Parent Ex. C at pp. 1, 13).

In November 2022, the parents initiated a neuropsychological evaluation to assess the student's cognitive and academic functioning (Parent Exs. C at p. 1; N ¶ 7).  In a report dated January 4, 2023, the private neuropsychologist reported that the student exhibited high average intellectual potential with language-based weaknesses consistent with diagnoses of a specific learning disorder with impairments in reading (dyslexia) and written expression (Parent Ex. C at

pp. 1, 8-9, 11-12, 13-14.)  The private neuropsychologist also reported that the student exhibited attentional and executive functioning weaknesses and that "[f]rom a diagnostic standpoint, a rule-out diagnosis of attention-deficit/hyperactivity disorder (ADHD)" was "most appropriate at th[at] time" (id. at p. 12).  Among other recommendations, the private neuropsychologist identified the following supports and services for the student: instruction as a special education student in a class where ICT services were delivered, with a small student-teacher ratio and appropriate peer group; daily "small group instruction with an experienced Orton-Gillingham (OG) trained provider," "or Special Education Teacher Support Services (SETSS) on a daily basis to target her language-based skill development"; school-based counseling; and accommodations for assignments and test-taking (id. at pp. 14-18).

Following receipt of the private neuropsychological evaluation, the parents "requested an initial IEP meeting" and provided the district with a copy of the evaluation report (Parent Ex. N ¶ 9).  In January 2023, the district conducted a social history interview of both parents and obtained parental consent for an initial evaluation of the student to determine her eligibility for special education services (Dist. Exs. 1 at pp. 17-20; 2 at p. 1).  In February 2023, the district conducted a classroom observation of the student and provided the parents with notice of a CSE meeting to take place on March 1, 2023 (Dist. Exs. 3 at p. 1; 4 at pp. 1-3).  Beginning in February 2023, the student received privately obtained Orton-Gillingham tutoring services outside of school in two 60-minute sessions per week (Parent Ex. N ¶ 8).

On March 1, 2023, a CSE convened for an initial meeting in which the student's mother participated (Parent Ex. N ¶¶ 10-11; Dist. Ex. 5 at p. 18).  The CSE determined the student was eligible for special education as a student with a learning disability and developed an IEP to be implemented on March 6, 2023 (Parent Ex. N ¶ 10; Dist. Ex. 5 at pp. 1, 18).[1,2]  The CSE recommended a 10-month school year program consisting of ICT services for English language arts (ELA), math, and social studies, along with school-based group counseling and testing accommodations, in a district nonspecialized public school (Parent Ex. N ¶ 10; Dist. Exs. 5 at pp. 12, 14, 16; 8 at p. 1; 9 at p. 1).  The district then obtained parental consent for the initial provision of services to the student, and sent a prior written notice to the parents memorializing the recommended program and a school location letter identifying the public school site the student was assigned to attend to receive the recommended special education programming (Dist. Exs. 7 at p. 1; 8 at pp. 1-4; 9 at p. 1).

On May 12, 2023, the student's mother signed an enrollment contract with Windward for the 2023-24 school year (Parent Ex. H at pp. 1, 4).  Under the contract's terms, the parents would become responsible for the full annual tuition on July 1, 2023, unless they sooner cancelled the student's enrollment by written notice (id. at p. 1).

---

[1] The student's eligibility for special education as a student with a learning disability is not in dispute (see 34 CFR 300.8[c][10]; 8 NYCRR 200.1[zz][6]).

[2] The operative IEP for the 2023-24 school year, which reflects the removal of school-based counseling services in June 2023, was entered into evidence as District Exhibit 5 (Dist. Ex. 5 at pp. 1, 18).  The original March 2023 IEP was not offered for admission (see IHO Exs. I-VI; Parent Exs. A-N; Dist. Exs. 1-12).  For consistency in this decision, that IEP will be referred to as the June 2023 IEP.

On June 12, 2023, the student's mother informed the district by an email to a member of the school based support team that the student would "receive outside counseling from a private psychologist" and no longer needed recommended school-based counseling services (Dist. Ex. 10 at p. 1). The CSE reconvened on June 16, 2023, removed school-based counseling services from the student's IEP, and notified the parents accordingly (Dist. Exs. 5 at p. 18; 11 at pp. 1-3; 12 at pp. 1-4).

On June 27, 2023, the student's mother informed the district by an email to the school principal that the private neuropsychologist had reevaluated the student and was now recommending a full-time special education program that used a multisensory approach (Parent Exs. E at pp. 1-2; N ¶¶ 12-13). In her email, the student's mother indicated that she would provide the reevaluation report once it was prepared (Parent Exs. E at p. 1; N ¶ 13). The school principal replied with an email in which she stated that the "summer IEP team" would need to reconvene to review the reevaluation report and make appropriate recommendations (Parent Ex. E at p. 1). In her reply, the school principal stated that the supervisor of psychologists would contact the parents to start the process (id.).

On August 15, 2023, the parents, through their attorney, provided the district with notice of their intent to unilaterally place the student at Windward for the 2023-24 school year (Parent Ex. B at pp. 1, 4). The CSE did not reconvene, and the parents proceeded with the student's enrollment at Windward (Parent Exs. N ¶¶ 13, 15; L ¶ 37). Under their contract with Windward, the cost of the student's tuition was $71,500.00 for her attendance from September 11, 2023 to June 14, 2024 (Parent Ex. I ¶¶ 3-4).

### A. Due Process Complaint Notice

In a due process complaint notice dated January 8, 2024, the parents, through their attorney, alleged that the district denied the student a free appropriate public education (FAPE) for the 2023-24 school year based on procedural flaws in the IEP's development and substantive deficiencies in the IEP itself (Parent Ex. A at pp. 1-4). The parents alleged that the recommended programming could not meet the student's academic and social-emotional needs and, further, that the recommended public school could not provide the small, structured, and supportive setting needed for the student to derive educational benefits (id. at pp. 2-3). The parents alleged that Windward's programming appropriately addressed the student's academic and social-emotional needs and was reasonably calculated to provide educational benefits (id. at p. 3). As relief, the parents sought tuition reimbursement at Windward for the entire 2023-24 school year (id. at p. 1, 3).

### B. Impartial Hearing Officer Decision

After two initial appearances, an impartial hearing convened on April 10, 2024 before an IHO appointed by the Office of Administrative Trials and Hearings (OATH) (see Tr. at pp. 1-102). In a decision dated June 24, 2024, the IHO denied the parents' requested relief in full (IHO Decision at pp. 1, 11). The IHO determined that the district offered the student a FAPE for the 2023-24 school year (id. at pp. 7-9). The IHO was not persuaded by the parents' argument that the district's failure to convene a CSE meeting in the summer to consider the private neuropsychologist's reevaluation constituted a denial of a FAPE (id.). The IHO further determined that equitable considerations do not favor the parents' request for relief because the parents failed

4

to "share relevant information" and provide adequate notice of their intent to unilaterally place the student at Winward (id. at pp. 9-10). More specifically, the IHO found that the parents' June 2023 email, which alerted the district to the private neuropsychologist's reevaluation, did not actually request a change to the student's IEP or convey the parents' need to make an immediate choice concerning the student's placement (id.). The IHO found that the parents never shared a copy of the reevaluation report with the district and did not advise the district that the student had been reevaluated until after the last day of school (id. at pp. 6, 9-10). The IHO further found that the formal notice of unilateral placement sent by email on August 15, 2023 provided no basis to "reopen" the student's IEP because it made no mention of the private neuropsychologist's reevaluation (id. at pp. 8-10). Moreover, the IHO found that, although the parents gave notice on August 15, 2023 of their intent to place the student at Windward ten business days prior to the start of the 2023-24 school year, by then, the parents were already obligated to pay the full cost of Windward tuition for the 2023-24 school under their enrollment contract (id. at pp. 9-10). Thus, according to the IHO, the parents never gave the district a genuine opportunity to reopen the student's IEP and forestall the unilateral placement (id.). Having resolved the FAPE determination and equitable consideration aspects of the Burlington/Carter analysis in the district's favor, the IHO declined to address whether Windward was an appropriate placement for the student (id. at p. 11).

**IV. Appeal for State-Level Review**

The parents appeal for state-level review. The parties' familiarity with the issues raised in the parents' request for review and the district's answer is presumed and, therefore, the allegations and arguments will not be recited here in detail. The gravamen of the parties' dispute is whether the IHO erred in determining that the district offered the student a FAPE for the 2023-24 school, that equitable considerations do not favor the parents, and, in declining to address the unilateral placement's appropriateness.

**V. Applicable Standards**

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley,

5

458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]).  Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203).  However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 580 U.S. at 404).  The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379).  Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132).  Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]).  The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192).  The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general

education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[3]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252).  In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

### A. CSE Process

At the impartial hearing, the parents alleged that the district denied the student a FAPE for the 2023-24 school year on various procedural grounds (Parent Ex. A at pp. 1-3).[4]  On appeal, the parents contend the IHO erred in determining that the district did not violate the IDEA by its failure to reconvene an IEP meeting in the summer of 2023 and by its failure to state, in a prior written notice, its reason for refusing to act in response to the parents' request to reopen the student's IEP (Req. for Rev. at pp. 10-11).  For the following reasons, I must affirm the IHO's determination that the district did not violate the IDEA's procedural requirements.

---

[3] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom.  The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 580 U.S. at 402).

[4] The due process complaint notice alleged that the district failed to identify the student as a student with a disability and initiate the process of developing an IEP (Parent Ex. A at p. 2).  The parents thereby implied a violation of the IDEA's "child find" provisions, an issue which the IHO's decision did not address (see IHO Decision at pp. 1-14).  In their request for review, the parents assert that the IHO's decision erroneously indicated that the parents' only bases for claiming a denial of a FAPE are the district's alleged failures to "reconvene an IEP meeting in the summer of 2023 and offer a placement consistent" with the private neuropsychologist's updated recommendations (Req. for Rev. at p. 6).  Without referencing a "child find" claim directly, the request for review further asserts that the IHO "ignored or misunderstood the array of claims" made in the due process complaint notice (id.).  These assertions are insufficient to preserve any issue for review on appeal.  Therefore, the implication of a "child find" violation will not be addressed here.

**1. Request to Reconvene**

In addition to the district's general obligation to review the IEP of a student with a disability at least annually, federal and State regulations require the CSE to revise a student's IEP as necessary to address "[i]nformation about the child provided to, or by, the parents" during the course of a reevaluation of the student (34 CFR 300.324[b][1][ii][C]; 8 NYCRR 200.4[f][2][ii]). State regulations additionally provide that if parents believe that their child's placement is no longer appropriate, they "may refer the student to the [CSE] for review" (8 NYCRR 200.4[e][4]). The United States Department of Education has indicated that "[g]enerally, an IEP meeting must take place before a proposal to change the student's placement can be implemented" (Letter to Green, 22 IDELR 639 [OSEP 1995]). Addressing a similar issue the district court has pointed to the annual review requirements mandated by the IDEA, but otherwise held that "there is no requirement that [a] CSE reconvene whenever additional information comes to its attention," however. (MN v. Katonah Lewisboro Sch. Dist., 2020 WL 7496435, at *12 [S.D.N.Y. Dec. 21, 2020].

The evidence in the hearing record does not indicate that the district was obligated to reconvene the CSE for an IEP meeting in summer 2023, as there is no evidence that the district received an affirmative request to reconvene the CSE to revise the student's IEP based on new information or new evaluative information for the CSE's consideration (see Application of a Student with a Disability, Appeal No. 12-071 [finding that the parents' expression of "willingness to meet with the CSE to discuss their concerns" did not trigger an obligation to reconvene the CSE]; cf. Application of a Student with a Disability, Appeal No. 23-278 [finding that the district's failure to reconvene the CSE was a procedural violation of the IDEA, amounting to the denial of a FAPE, where the parent sent a written request to reconvene accompanying a neuropsychological evaluation report]). In her email to the public school principal on June 27, 2023, the student's mother referenced the student's continued academic challenges and stated that the private neuropsychologist had reevaluated the student (Parent Ex. E at pp. 1-2). In that June 2023 email, the student's mother expressed interest in a different public school placement consistent with the private neuropsychologist's updated recommendations, but she did not request an IEP meeting (see id.).[5] The student's mother did not provide the private reevaluation report at that time and, in fact, indicated that the report was not yet available (Parent Exs. N ¶¶ 13-15; E at pp. 1-2). The parents obtained a reevaluation report, but the hearing record lacks evidence that the parents shared a copy with the district or even informed the district that the report had become available (Parent Ex. D at pp. 1-7).[6]

---

[5] It was the public school principal who suggested that the summer "IEP team" would need to open the student's IEP as a reconvene to review the reevaluation report (Parent Ex. E at p. 1); however, the evaluation report did not materialize over the summer.

[6] Although unclear, it may be inferred that the parents obtained the reevaluation report prior to the start of the 2023-24 school year, as the report is dated August 19, 2023 (Parent Ex. D at p. 1). Moreover, the student's mother testified that she conveyed the parents' plan to send the student to private school, based on the private neuropsychologist's recommendations, in an email to the public school principal on August 16, 2023 (Parent Ex. N at ¶ 14). This email was not offered for admission into evidence at the impartial hearing, and there is no other evidence that the parents mentioned the private reevaluation after the June 2023 email and prior to the start of the 2023-24 school year (see Parent Exs. N ¶¶ 13-15; B at pp. 1-3).

In a letter dated August 15, 2023, the parents' attorney "request[ed] that the CSE contact [the parents] immediately to address" their dissatisfaction with the student's current program and placement and expressed their intent to unilaterally place the student at Windward (Parent Ex. B at pp. 1-3). The parents' attorney did not mention the private neuropsychologist's reevaluation of the student or the resulting recommendations (see id.). Therefore, even assuming that the August 2023 notice may be construed to contain a request to reconvene, it did not trigger an obligation to reconvene, as it gave no indication that the parents possessed new information.

### 2. Prior Written Notice

State and federal regulations require that a district provide parents of a student with a disability with prior written notice "a reasonable time before the school district proposes to or refuses to initiate or change the identification, evaluation, educational placement of the student or the provision of a [FAPE] to the student" (34 CFR 300.503[a]; 8 NYCRR 200.1[oo]; 200.5[a][1]). Pursuant to State and federal regulation prior written notice must include a description of the action proposed or refused by the district; an explanation of why the district proposed or refused the action; a description of the other options that the CSE considered and the reasons why those options were rejected; a description of each evaluation procedure, assessment, record, or report the CSE used as a basis for the proposed or refused action; and a description of the other factors relevant to the CSE's proposal or refusal (34 CFR 300.503[b]; 8 NYCRR 200.5[a][3]). In a guidance letter, the United States Department of Education indicated that parents may request a CSE meeting at any time and that[,] if the district determines not to grant the request, it must provide the parents with written notice of its refusal, "including an explanation of why the [district] has determined that conducting the meeting is not necessary to ensure the provision of FAPE to the student" (Letter to Anonymous, 112 LRP 52263 [OSEP Mar. 7, 2012]; see 34 CFR 300.503; 8 NYCRR 200.5[a]). However, a district's failure to comply with procedural requirements of the IDEA only constitutes a denial of a FAPE if the procedural violation deprived the student of educational benefits or significantly impeded the parents opportunity to participate in the decision-making process regarding the provision of a FAPE to the student (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]).

The hearing record does not establish the district's obligation to explain its refusal to reconvene the CSE for an IEP meeting in summer 2023, as it contains no evidence that the district received an unambiguous request to reopen the student's IEP (see Mason v. Carranza, 2023 WL 6201407, at *8 [E.D.N.Y. Sept. 22, 2023] [rejecting the argument that the CSE failed to reconvene where it was unclear that it had been received by the district]; cf. Application of a Student with a Disability, Appeal No. 15-099 [finding that the district violated the IDEA by failing to either reconvene the CSE or provide a written notice explaining its refusal to do so in response to the parent's unambiguous request that the CSE reconvene]). As explained above, neither the email sent on June 27, 2023 nor the letter dated August 15, 2023 unambiguously requested an IEP meeting (see Parent Exs. E at pp. 1-2; B at pp. 1-3). Nor does the record include testimony that the parents made such a request (see Parent Ex. N ¶¶ 13-15).

To the extent that the August 2023 letter may be construed to contain a request to reconvene the CSE, the district's failure to reconvene the CSE or provide a prior written notice in response did not constitute a denial of a FAPE (see Application of a Student with a Disability, Appeal No. 20-038 [finding that the district's "failure to provide prior written notice of the CSE's decision not

to reconvene did not amount to a denial of a FAPE" where the parents had recently participated in an IEP meeting at which the "CSE had extensive information about the student upon which to base its program and placement decisions"]).  As of August 15, 2023, fewer than six months had passed since the student's mother participated in an IEP meeting at which the CSE considered a recent neuropsychological evaluation, among other information, and adopted many of the private neuropsychologist's recommendations (see Parent Exs. N ¶¶ 10-11; C at pp. 14-17; Dist. Exs. 5 at pp. 1-5, 12-14, 18; 8 at p. 1).  The parents declined to share the reevaluation report.  Therefore, the district possessed no information concerning the student's needs that the CSE had not already considered.  In other words, the district possessed no information likely to impact a change in the CSE's recommendations prior to the start of the 2023-24 school year.

### B. The June 2023 IEP

At the impartial hearing, the parents alleged a denial of a FAPE for the 2023-24 school year based on the IEP's substantive inadequacy (see Parent's Ex. A at pp. 1-3).  On appeal, the parents contend that the IHO erred in determining that the district sustained its burden of proving the substantive adequacy of the June 2023 IEP (see Req. for Rev. at pp. 5-7).  For the following reasons, the evidence in the hearing record supports the IHO's determination that the district offered a FAPE to the student.

#### 1. Burden of Proof

Under the IDEA, the burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer v. Weast, 546 U.S. 49, 59-62 [2005] [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).[7]  Under State law, however, the burden of proof has been placed on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 386 [2d Cir. 2014]; C.F. v. New York City Dep't of Educ., 746 F.3d 68, 76 [2d Cir. 2014]; R.E., 694 F.3d at 184-85).  Thus, the district has the burden of proving that the IEP it created was appropriate to meet the student's special education needs.

In Endrew F., the Supreme Court held that the "reviewing court may fairly expect [school] authorities . . . to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances"(580 U.S. at 404).  While the district's burden does not require that the district call witnesses, it does require the district to defend its recommendations and provide evidence that explains such recommendations. If the district intends to rest its case on documentary evidence alone, the district should offer into evidence all documentation pertaining to the evaluation of the

---

[7] Ordinarily, which party bore the burden of persuasion in the impartial hearing becomes relevant only if the case is one of those "very few" in which the evidence is equipoise (Schaffer, 546 U.S. at 58; Reyes v. New York City Dep't of Educ., 760 F.3d 211, 219 [2d Cir. 2014]; M.H., 685 F.3d at 225 n.3; T.B. v. Haverstraw-Stony Point Cent. Sch. Dist., 933 F. Supp. 2d 554, 565 n.6 [S.D.N.Y. 2013]; A.D. v. New York City Dep't of Educ., 2013 WL 1155570, at *5 [S.D.N.Y. Mar. 19, 2013]; see F.L. v. New York City Dep't of Educ., 553 Fed. App'x 2, 4 [2d Cir. Jan. 8, 2014]).

student and the CSE's recommendations, including prior written notices (34 CFR 300.503[a]; 8 NYCRR 200.5[a]; see also L.O. v. New York City Dep't of Educ., 822 F.3d 95, 110-11 [2d Cir. 2016] [discussing the consequences of a CSE's failure to adequately document evaluative data, including that reviewing authorities might be left to speculate as to how the CSE formulated the student's IEP]).

Here, the district's presentation of evidence included the June 2023 IEP, as well as the prior written notices, parental consents, and email correspondence pertaining to the district's initial evaluation of the student, development of the student's IEP in March 2023, the initial provision of services to the student, and revision of the IEP in June 2023 (see Tr. pp. 38-43).  Additionally, the district presented the social history evaluation and classroom observations, materials resulting from the district's evaluation of the student which the CSE used in developing the student's IEP (see Tr. pp. 37-43; Dist. Exs. 1 at pp. 17-20; 3 at p. 1).  Reports of the privately obtained neuropsychological evaluation and the psychoeducational assessment, which the CSE also used in developing the student's IEP, were absent from the district's presentation, although the parents presented the private neuropsychologist's report (see Tr. pp. 37-43; Dist. Ex. 8 at p. 1).

The parents contend that the district's presentation of documents, without any testimony, failed to sustain its burden of proving the adequacy of the management needs and annual goals contained in the IEP, as well as the adequacy of the recommended program and placement.  The parents contend that the district's documentary evidence does not clearly explain which materials the CSE used to develop the IEP, why the CSE did not consider more services, or how the recommended program is reasonably calculated to meet the student's needs.  Thus, according to the parents, the IHO improperly speculated as to how CSE developed the IEP's content.

Despite gaps in its presentation, the district presented sufficient documentary evidence to sustain its burden of proof (see Application of a Student with a Disability, Appeal No. 24-084, [finding that the district met its burden of proving that it recommended an appropriate program even though the district did not present all the evaluative informative on which the CSE relied]). Contrary to the parents' contention, the prior written notice dated March 7, 2023 explicitly states which materials the CSE used to develop the student's IEP (Dist. Ex. 8 at p. 1).  The June 2023 IEP contains repeated references to the privately obtained neuropsychological evaluation and descriptions of the private neuropsychologist's findings (Dist. Ex. 5 at pp. 1-3).  Moreover, the June 2023 IEP indicates that the CSE considered alternative options for the student and states the CSE's rationale for rejecting those alternatives (id. at p. 18).[8]  As further explained below, the June 2023 IEP itself contains sufficient information to enable a fact-specific analysis of the parents' particular challenges to its substantive adequacy.

### 2. The Student's Needs

A review of the student's needs and then-current functioning will provide the further background necessary to evaluate the appropriateness of the June 2023 CSE's recommendations.

---

[8] The IEP states that the CSE considered and rejected general education with related services only because the student "requires the support of special education in core subject areas to address" language-based weaknesses and that the CSE deemed 12:1 special class "too restrictive" (Dist. Ex. 5 at p. 18).

11

The January 2023 neuropsychological evaluation report indicated that administration of the Wechsler Intelligence Scale for Children-Fifth Edition (WISC-V) to the student yielded scores within the average or high average range on all scales, and a full scale IQ of 110 (high average) (Parent Ex. C at p. 19).  Measures of the student's academic skills, including administration of the Wechsler Individual Achievement Test, Fourth Edition (WIAT-4), the Gray Oral Reading Tests-Fifth Edition (GORT-5) Form B, and the Kaufman Test of Educational Achievement-Third Edition (KTEA-3) Form A, yielded varied results (id. at pp. 7-9, 20).  Specifically, the private neuropsychologist reported that the student's foundational reading skills were "under-developed," her written expression skills were "not only predominantly below grade-level, but also [we]re significantly discrepant with her intellectual potential," and she exhibited "clear vulnerabilities" with regard to math skills (id. at pp. 8-9, 20).  The private neuropsychologist administered various measures of the student's social/emotional functioning that indicated "some social-emotional vulnerabilities that required ongoing monitoring and support", interviewed the parents, and also interviewed the student's teachers regarding her classroom functioning, both social and academic (id. at pp. 9-11, 23-24).

The student's needs at the time of the March and June 2023 CSE meetings, including results of the January 2023 private neuropsychological evaluation, were identified in the present levels of performance section of the June 2023 IEP (Dist. Ex. 5 at pp. 1-5).  The IEP noted the private neuropsychologist's finding that the student met the criteria for diagnoses of a specific learning disorder with impairments in reading (dyslexia) and written expression (id. at p. 1).  The IEP stated that, based on the neuropsychological testing results, the student "exhibit[ed] intellectual potential within the overall high average range," and her "[k]ey strengths" included her "core verbal comprehension skills," "verbal abstract reasoning and fund of vocabulary," and "fluid reasoning abilities" (id.).  The IEP further stated that, according to the neuropsychological testing results, the student possessed "strong potential for complex reasoning and comprehension of information in both visual-based and language-based formats" and her "working memory and routine information processing skills [were] age-appropriate" (id.).  As included in the IEP, the private neuropsychologist reported that the student's "attentional and executive functioning weaknesses [could] impact her availability for learning, her ability to complete work that is consistent with her strong potential, and her capacity to engage in lengthier, more complex, and/or independent tasks" (compare Parent Ex. C at p. 12, with Dist. Ex. 5 at p. 2).

Turning to the student's then-current classroom functioning, the June 2023 IEP described the student as a visual learner and "inquisitive child" who preferred to learn in small groups or individually with a teacher and "benefit[ed] from using a study carrel and having an explicit location to place her materials" (Dist. Ex. 5 at p. 3).  The IEP indicated that, while the student was independent and responsible for her belongings, she presented with some difficulty in managing her time and transitioning from one activity to the next (id. at p. 2).  As for the student's reading skills, the IEP indicated that she advanced four reading levels since the beginning of the second grade and her ability to make self-corrections without teacher prompting was emerging (id.).  However, the IEP stated that the student struggled to independently decode unknown words, mistaking word-ending sounds specifically (id.).  The IEP indicated that the student's writing, which was neat, with use of spacing and upper- and lower-case letters, was showing improvement (id.).  With one to one and small group instruction, the student wrote a five-page book, and the student was "beginning to apply her knowledge of letter sounds, vowel teams and glued sounds when spelling unknown words" (id.).  In math, the student's struggle to identify place value and

difficulty breaking down three-digit numbers into hundreds, tens, and ones created challenges with word problems (id. at p. 3). The IEP indicated that the student benefited from the "use of visuals and math tools when completing a variety of problems" (id.).

In his January 2023 evaluation report, the private neuropsychologist reported that, according to the student's teachers, the student had difficulty "keeping pace with multi-step processes" and was often "pulled into a smaller group setting" wherein the teachers observed her improved responsiveness (Parent Ex. C at p. 10). He further reported that, according to the student's teachers, the student's "preference for following her own agenda [could] interfere with . . . compliance with teacher instructions" (id.). According to the private neuropsychologist, the student's teachers were concerned about her academic confidence, as she often needed reassurance and showed hesitancy to use known strategies before asking for assistance from a teacher (id. at pp. 10-11). In his recommendations, the private neuropsychologist stated that the student "require[ed] instruction as a special education student in a nurturing and supportive Integrated Co-Teaching (ICT) classroom setting with a small student-teacher ratio, where individualized instruction and specialized support c[ould] be provided" (id. at p. 14).

As for the student's social skills, the IEP indicated that she "struggle[d] with listening to the ideas of others and perspective taking" but was "working on her relationships with peers and adults in regard to following the group plan and understanding how her actions and words c[ould] make others feel" (Dist. Ex. 5 at pp. 3-4). The IEP referenced the results of the neuropsychological evaluation, which indicated that the student "exhibit[ed] characteristics of ADHD in addition to anxiety and emotional dysregulation" (id. at p. 3). The IEP further indicated that the student "often exhibit[ed] emotional lability, intense emotional reactions disproportionate to the situation, and a poor frustration tolerance, particularly when confronting perceived challenges and/or less preferred tasks" (id.).

Finally, both the private neuropsychologist's report and the IEP indicated that the student was in good health, despite seasonal allergies, with no identified physical development needs at that time (Parent Ex. C at p. 1; Dist. Ex. 5 at p. 4).

### 3. Management Needs and Annual Goals

The parents contend on appeal that the IHO "improperly endorsed" the IEP management needs as sufficient to address the student's needs, and that the management needs "did not address all issues discussed" at the CSE meeting.

Management needs are defined by State regulations as "the nature of and degree to which environmental modifications and human material resources are required to enable the student to benefit from instruction" and shall be determined in accordance with the factors identified in the areas of academic or educational achievement and learning characteristics, social and physical development (8 NYCRR 200.1[ww][3][i][d]).

The June 2023 CSE identified the student's academic needs, including those that were of concern to the parents; specifically, that the student required "interventions to facilitate focus, sustained attention, and self- monitoring" and that she would benefit from supports that provided explicit instruction, scaffolding, and structure (Dist. Ex. 5 at p. 3). According to the IEP, the CSE

13

also identified that the student benefitted from small groups and working 1:1 with teacher support and a multidisciplinary approach to reading, with help for visual scanning and attention to ensure the student did "not skip words or lines" (id.).  Further, the IEP indicated that as the student's "basic skills" were solidified, she needed to focus on comprehension skills (id.).  Additionally, cues, prompts, and checks for understanding were identified as important to help the student direct her attention (id.).  The CSE also identified that staff working with the student should use "hands-on or interactive activities when possible," and that she benefitted "from repeated practice and extra positive reinforcements" (id.).

       Consistent with the January 2023 neuropsychological evaluation report, the June 2023 IEP identified the following resources and strategies to address the student's management needs: extended time on assignments, educational exams, and standardized testing; a distraction-reduced testing environment (e.g., separate location, study carrel); occasional breaks to minimize mental fatigue and maintain stamina; instructions and questions read aloud for comprehension; checklists to support completion of tasks/steps; use of visuals and math tools for completing a variety of problems; and praise, reassurance, and validation (compare Parent Ex. C at pp. 15-17 with Dist. Ex. 5 at p. 4).  In addition, the CSE recommended various testing accommodations for the student including extended time, specifically, time and a half; a separate location with no more than 12 students; and on-task focusing, specifically verbal and gestural prompts for focus and attention, on all State and local assessments (Dist. Ex. 5 at p. 14).

       Contrary to the parents' contention, the June 2023 IEP indicated that the CSE developed the student's management needs directly from her levels of performance and academic functioning, parent input, as well as the results of the neuropsychological evaluation.  The CSE adopted many of the management strategies the private neuropsychologist recommended, as well as those recommendations from the student's then-current classroom teachers (compare Parent Ex. C at pp. 15-17, with Dist. Ex. 5 at pp. 2-5).  Moreover, the identified management needs aligned with the student's needs as reported in the present levels of performance section of the IEP and largely address the parents' reported concerns (see Dist. Ex. 5 at pp. 1-5).

       Next, the parents contend on appeal that the IHO improperly endorsed the June 2023 IEP annual goals as sufficient to address the student's needs.  Specifically, the parents assert that the recommended annual goals failed to specify a baseline of functioning, failed to address every area of the student's deficits, and were not achievable as the student was not meeting the annual goals in the recommended program.

       An IEP must include a written statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability to enable the student to be involved in and make progress in the general education curriculum; and meet each of the student's other educational needs that result from the student's disability (see 20 U.S.C. § 1414[d][1][A][i][II]; 34 CFR 300.320[a][2][i]; 8 NYCRR 200.4[d][2][iii]).  Each annual goal shall include the evaluative criteria, evaluation procedures, and schedules to be used to measure progress toward meeting the annual goal during the period beginning with placement and ending with the next scheduled review by the committee (8 NYCRR 200.4[d][2][iii][b]; see 20 U.S.C. § 1414[d][1][A][i][III]; 34 CFR 300.320[a][3]).

The CSE developed six annual goals (Dist. Ex. 5 at pp. 6-10). On the issue of the measurability, review of the IEP shows that each of the six annual goals included evaluative criteria (e.g., 3 out of 4 trials, 4 out of 5 trials), the methods used to measure progress (e.g., checklist, running record), and schedule of when progress will be measured ("1 time per 8 weeks") (id.). Contrary to the parents' contention, nothing in the IDEA or its State counterpart "requires that an IEP contain 'baseline levels of functioning' from which progress can be measured" (R.B. v. New York City Dep't of Educ., 2013 WL 5438605, at * 13 [S.D.N.Y. Sept. 27, 2013]; C.M. v. New York City Dep't of Educ., at *20 [S.D.N.Y. Feb. 14, 2017]).

Next, regarding the parents' claim that the annual goals failed to address all of the student's needs, the IDEA does not require that a district create a specific number of goals for each of a student's deficits, and the failure to create a specific annual goal does not necessarily rise to the level of a denial of FAPE; rather, a determination must be made as to whether the IEP, as a whole, contained sufficient goals to address the student's areas of need (J.L. v. New York City Dep't of Educ., 2013 WL 625064, at *13 [S.D.N.Y. Feb. 20, 2013]; see C.M., 2017 WL 607579, at *20-*21). Moreover, where an IEP contains specific, objectively measurable "short-term objectives to supplement otherwise broad annual goals, the vagueness of the annual goals alone will not rise to the level of the denial of a FAPE" (D.A.B. v. New York City Dep't of Educ., 973 F.Supp.2d 344, 359-60 [S.D.N.Y. Sept. 16, 2013]; A.D., 2013 WL 1155570, at *10-11).

The CSE developed annual goals that targeted the student's needs in the areas of reading comprehension, spelling, writing, executive functioning, and math operations and problem solving (Dist. Ex. 5 at pp. 6-11). Specifically, the annual goals were designed for the student to improve her "use [of] classroom tools to spell sight words" and to "generate a plan to write a story across 5 pages," both of which the IEP indicated the student achieved in the IEP's first progress reporting period, as measured in scheduled trials using a checklist (id. at pp. 7-8). An additional goal, in which the IEP indicated that the student had made progress but had not yet achieved, stated that the student would "use each part of unknown words to decode" with progress measured in scheduled trials using checklists and running records (id. at p. 7). Yet another goal, in which the IEP indicated the student was progressing, as measured in scheduled trials using a checklist, stated that the student would "complete 2-3 directives in a given time by following the group plan" (id. at p. 9). Lastly, the IEP noted progress in two math goals, to "decompose 3-digit numbers into hundreds, tens and ones" and to "add and subtract fluently within 20," again using scheduled trials and checklists to measure progress (id. at p. 10).

To the extent the parents assert that the annual goals were not achievable because the student was not meeting the IEP goals in the recommended program, review of the IEP, as discussed above, shows that the student was making progress toward the annual goals that were developed in spring 2023, which had only been implemented during the latter portion of the 2022-23 school year (Dist. Ex. 5 at pp. 6-11).

On appeal, the parents have not identified areas of the student's needs that went unaddressed by the management strategies and annual goals, and contrary to their assertions, the CSE recommended supports and strategies to address the student's management needs consistent with the neuropsychological evaluation recommendations, developed annual goals to address her academic needs, and the IEP reflected that the student was making progress toward and had achieved some of the annual goals in the June 2023 IEP.

15

#### 4. ICT Services

The parents contend that the IHO erred in determining that the recommended special education programming consisting of ICT services offered the student a FAPE. According to the parents, the recommended program could not meet the student's identified academic and social/emotional needs.

Review of the student's IEP shows that, as describe above in more detail, the CSE considered information from the student's teachers, the parents, as well as the results of district and private testing, and identified the student's areas of weakness (Dist. Exs. 5 at pp. 1-5; 8 at pp. 1-2; 12 at pp. 1-2). In conjunction with the management strategies and annual goals, the CSE recommended that the student receive 10 periods per week of ICT services in ELA, six periods per week of ICT services in math, and five periods per week of ICT services in social studies, all delivered in the general education classroom (id. at p. 12).

State regulation defines ICT services as the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students and states that the maximum number of students with disabilities receiving ICT services in a class shall be determined in accordance with the students' individual needs as recommended on their IEPs, provided that the number of students with disabilities in such classes shall not exceed 12 students and that the school personnel assigned to each class shall minimally include a special education teacher and a general education teacher (8 NYCRR 200.6[g]).

The IDEA further requires that a student's recommended programming be provided in the LRE (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.107, 300.114[a][2][i], 300.116[a][2], 300.117; 8 NYCRR 200.1[cc], 200.6[a][1]; see T.M., 752 F.3d at 161-67; Newington, 546 F.3d at 111; Gagliardo, 489 F.3d at 105; Walczak, 142 F.3d at 132; Patskin v. Bd. of Educ. of Webster Cent. Sch. Dist., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]). In determining an appropriate placement in the LRE, the IDEA requires that students with disabilities be educated to the maximum extent appropriate with students who are not disabled and that special classes, separate schooling, or other removal of students with disabilities from the general educational environment may occur only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily (20 U.S.C. § 1412[a][5][A]; see 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.6[a][1]; Newington, 546 F.3d at 112, 120-21; Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1215 [3d Cir. 1993]; J.S. v. N. Colonie Cent. Sch. Dist., 586 F. Supp. 2d 74, 82 [N.D.N.Y. 2008]; Patskin, 583 F. Supp. 2d at 430; Watson, 325 F. Supp. 2d at 144; Mavis v. Sobol, 839 F. Supp. 968, 982 [N.D.N.Y. 1993]). The placement of an individual student in the LRE shall "(1) provide the special education needed by the student; (2) provide for education of the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities; and (3) be as close as possible to the student's home" (8 NYCRR 200.1[cc]; 8 NYCRR 200.4[d][4][ii][b]; see 34 CFR 300.116). Consideration is also given to any potential harmful effect on students or on the quality of services that they need (34 CFR 300.116[d]; 8 NYCRR 200.4[d][4][ii][c]).

The CSE determined that with the provided special education teacher support to address the student's language-based weaknesses, the student was anticipated to make progress in the general education curriculum (Dist. Ex. 5 at p. 5). According to the prior written notices, the CSE

16

considered placement options such as general education and related services only, which were rejected as the student required the support of a special education in core subject areas to address weaknesses in language-based areas (Dist. Exs. 8 at p. 2; 12 at p. 2). A 12:1 special class placement in a community school was also considered and rejected as "too restrictive" (Dist. Exs. 8 at p. 2; 12 at p. 2).

The parents contend on appeal that the IHO erred by ignoring the private neuropsychologist's "full recommendations," which included small group instruction with an Orton-Gillingham provider or SETSS to target the student's language-based skill development.[9] The parents also dispute the IHO's finding that the evidence shows no indication that they requested SETSS or any other additional supports at the CSE meeting, citing to the neuropsychological evaluation report recommendations, and the "uncontested testimony" that the parent asked about what additional supports could be provided to the student to address her dyslexia.

In developing the recommendations for a student's IEP, the CSE must consider the results of the initial or most recent evaluation; the student's strengths; the concerns of the parents for enhancing the education of their child; the academic, developmental, and functional needs of the student, including, as appropriate, the student's performance on any general State or district-wide assessments as well as any special factors as set forth in federal and State regulations (34 CFR 300.324[a]; 8 NYCRR 200.4[d][2]). A CSE must consider independent educational evaluations whether obtained at public or private expense, provided that such evaluations meet the district's criteria, in any decision made with respect to the provision of a FAPE to a student (34 CFR 300.502[c]; 8 NYCRR 200.5[g][1][vi]). However, consideration does not require substantive discussion, or that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight or adopt their recommendations (Mr. P. v. W. Hartford Bd. of Educ., 885 F.3d 735, 753 [2d Cir. 2018], citing T.S. v. Ridgefield Bd. of Educ., 10 F.3d 87, 89-90 [2d Cir. 1993]; Watson v. Kingston City Sch. Dist., 325 F. Supp. 2d 141, 145 [N.D.N.Y. 2004] [noting that even if a district relies on a privately obtained evaluation to determine a student's levels of functional performance, it need not adopt wholesale the ultimate recommendations made by the private evaluator], aff'd, 142 Fed. App'x 9 [2d Cir. July 25, 2005]; see Michael P. v. Dep't of Educ., State of Hawaii, 656 F.3d 1057, 1066 n.9 [9th Cir. 2011]; K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 805-06 [8th Cir. 2011]; Evans v. Dist. No. 17, 841 F.2d 824, 830 [8th Cir. 1988]; James D. v. Bd. of Educ. of Aptakisic-Tripp Community Consol. Sch. Dist. No. 102, 642 F. Supp. 2d 804, 818 [N.D. Ill. 2009]).

---

[9] The term SETSS is not defined in the State continuum of special education services (see NYCRR 200.6), and the manner in which those services are treated in a particular case is often in the eye of the beholder. As has been laid out in prior administrative proceedings, the term is not used anywhere other than within this school district and a static and reliable definition of "SETSS" does not exist within the district, and unless the parties and the hearing officer take the time to develop a record on the topic in each proceeding it becomes problematic (see Application of the Dep't of Educ., Appeal No. 20-125). For example, SETSS has been described in a prior proceeding as "a flexible hybrid service combining Consultant Teacher and Resource Room Service" that was instituted under a temporary innovative program waiver to support a student "in the general education classroom" (Application of a Student with a Disability, Appeal No. 16-056), and in another proceeding it was suggested that SETSS was more of an a la carte service that is completely disconnected from supporting the student in a general education classroom setting (Application of a Student with a Disability, Appeal No. 19-047).

Contrary to the parents' contention, the CSE was not required to adopt the private neuropsychologist's recommendations in full (Mr. P., 885 F.3d at 753; Watson, 325 F. Supp. 2d at 145). Nevertheless, the content of the June 2023 IEP closely aligned with the private neuropsychologist's January 2023 findings and recommendations that were available to the CSE, in that the CSE adopted many of the private neuropsychologist's recommendations with respect to management needs and testing accommodations (compare Parent Ex. C at pp. 14-17, with Dist. Ex. 5 at pp. 1-5, 12-14, 18). Additionally, consistent with the private neuropsychologist's recommendations, the CSE initially recommended school-based counseling, which the CSE later removed from the student's IEP at the parents' request, and ICT services (compare Parent Ex. C at p. 14, with Dist. Exs. 5 at p. 18; 10 at p. 1; 11 at pp. 1-3; 12 at pp. 1-4).

The private neuropsychologist's summer 2023 reevaluation, or "academic update," which recommended a more supportive placement, is inconsequential, as "a substantively appropriate IEP may not be rendered inadequate" by subsequent events or evaluative information "not before the CSE" (D.A.B., 973 F.Supp.2d at 361-62; see also S.W. v. N.Y. City Dep't of Educ., 92 F.Supp.3d 143, 158 [S.D.N.Y. 2015]). Moreover, while the district was required to provide the parents an opportunity to participate in the development of the student's IEP, the district was not required to accede to the parents' requests (see F.L., 735 Fed. App'x at 40; E.F. v. New York City Dep't of Educ., 2013 WL 4495676, at *17 [E.D.N.Y. Aug. 19, 2013]; Sch. for Language & Commc'n Dev. v. New York State Dep't of Educ., 2006 WL 2792754, at *7 [E.D.N.Y. Sept. 26, 2006]).

The parents further contend that, even with private tutoring outside of school, ICT services failed to enable the student to function at grade level and make progress. In her affidavit, the student's mother testified that she expressed concern that the CSE's recommendations merely "formalized the supports [the student] was [already] receiving at the time of the [March 2023] IEP meeting" (Parent Ex. N ¶ 11).[10] The student's mother testified that, "at the time of the IEP meeting," the student's "teachers reported that she was having difficulty with managing her time, sustaining attention, transitioning between activities, social awareness, and coping skills and that she required small group and 1:1 teacher instruction in writing and math" (id.). According to the student's mother, the student "had been in the ICT class for a year and a half with private tutoring and was still below grade level and not progressing" (id.).

However, the June 2023 IEP resulted from an initial referral for special education services. The student began receiving special education services, which included counseling, on or around March 6, 2023, when the IEP was implemented (Parent Ex. N ¶ 10; District Ex. 5 at pp. 1, 18). The hearing record includes no evidence of the extent to which the student benefited from the ICT program as a general education student in an ICT class. Nor does the hearing record include any independent evidence of the student's progress or lack of progress during her prior school year in an ICT class as a general education student. Indeed, the record evidence includes no report cards or progress notes from the student's prior school year which may or may not have indicated a need for academic interventions. While the student may have benefited from the ICT program prior to March 2023, she only received special education support throughout the school day for approximately four months, from about March 2023 through about June 2023, prior to her

---

[10] In contrast, the private neuropsychologist's January 2023 evaluation report states that, while the parents had "secured . . . private tutoring on a weekly basis" to target the student's' academic skills, "no special education supports [had] been given" (Parent Ex. C at p. 2).

unilateral placement at Windward. In any event, the "IDEA does not . . . articulate any specific level of educational benefits that must be provided through an IEP," and the district was not required to guarantee a particular outcome (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189).

Finally, it was reasonable for the CSE to reject a special class placement as "too restrictive" based on the information available to the CSE at the time it convened (Dist. Ex. 5 at p. 18). The student's abilities and level of functioning suggested that, with the support of a full-time special education teacher, the student would have received meaningful educational benefits while placed with nondisabled peers and that removal from the general education setting was not justified. Given that a student's recommended program must be provided in the LRE, the CSE should not be faulted for considering the restrictiveness of the recommended placement and its place on the continuum of services even if the parents perceive the resulting placement as less ideal (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo, 489 F.3d at 108; Walczak, 142 F.3d at 132).

## VII. Conclusion

Having determined that the record evidence supports the IHO's determination that the district offered the student a FAPE for the 2023-24 school year, the necessary inquiry is at an end, and I need not reach the issues of whether the parents' unilateral placement of the student at Windward was an appropriate placement for the student or whether equitable considerations supported the parents' request for relief (Mrs. C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]; Walczak, 142 F.3d at 134).

I have considered the parties' remaining contentions and find it is unnecessary to address them in light of my determinations herein.

**THE APPEAL IS DISMISSED.**

**Dated:** **Albany, New York**
**October 7, 2024**                                  _____
                                                    **JUSTYN P. BATES**
                                                    **STATE REVIEW OFFICER**