**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **M.B., et al.,** | |
| **Plaintiffs,** | **1:25-cv-01090 (SDA)** |
| **-against-** | **OPINION AND ORDER** |
| **City School District of the City of New York,** | |
| **Defendant.** | |

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

Plaintiffs M.B. and J.B. (the "Parents"), individually and on behalf of their child E.B., bring this action, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and related laws and regulations, seeking reversal of the decision by a State Review Officer ("SRO") finding that the New York City Department of Education ("DOE" or "District") offered E.B. a free and appropriate public education ("FAPE") for the 2023-2024 school year and denying their request for reimbursement of E.B.'s private school tuition costs. (Compl., ECF No. 1.) Now before the Court are the parties' cross-motions for summary judgment. (*See* Pls.' Mot., ECF No. 24; Def.'s Cross Mot., ECF No. 30.) For the reasons set forth below, Plaintiffs' motion is DENIED and Defendant's cross-motion is GRANTED.

**BACKGROUND**

I.      **Statutory Framework**

"The IDEA was designed, *inter alia*, to protect the rights of children with disabilities as well as the rights of their parents and 'to ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'"

*W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 133 (2d Cir. 2019) (quoting 20 U.S.C. § 1400(d)(1)(A)). "The [IDEA] requires States receiving federal funding to make a [FAPE] available to all children with disabilities residing in the State[.]" *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 232 (2009). "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits and provided in conformity with an individualized education program, or [Individualized Education Program ('IEP')]." *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 214 (2d Cir. 2014) (cleaned up); *see also* 20 U.S.C. § 1414(d).

The IEP, which "is the centerpiece of the IDEA's education delivery system . . . constitutes a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *W.A.*, 927 F.3d at 133 (internal quotations omitted). "A school district meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with the IDEA's procedural and substantive requirements." *N.B. v. New York City Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (citing *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 U.S. 176, 206-07 (1982)). "In New York, local Committees on Special Education ('CSEs') are responsible for developing IEPs and are tasked with identifying an educational program tailored to the student's particular needs and achievement levels." *W.A.*, 927 F.3d at 133; *see also* N.Y. Educ. Law § 4402(1)(b)(1).

"Parents who believe a child has been denied a FAPE may enroll the child in a private school at their own financial risk and seek retroactive reimbursement from the school district for

the cost of the private school." *W.A.*, 927 F.3d at 133 (citing *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)); *see also* 20 U.S.C. § 1412(a)(10)(C)(ii). The parents must provide notice ten business days before removing the child from the public school. *See* 20 U.S.C. § 1412(a)(10)(C)(iii). Parents seeking tuition reimbursement then must file a due process complaint challenging the appropriateness of the IEP. *See* S.*M. v. Eastchester Union Free School District*, No. 24-CV-09273 (VB), 2026 WL 396110, at *2 (S.D.N.Y. Feb. 12, 2026). If the parents and the school district cannot resolve the complaint, an Impartial Hearing Officer ("IHO") appointed by the local board of education conducts an "impartial due process hearing[.]" *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (quoting 20 U.S.C. § 1415(f)); *see also* N.Y. Educ. Law § 4404(1). "An IHO's decision may, in turn, be appealed to [an SRO], who is an officer of the State's Department of Education." *M.H.*, 685 F.3d at 225. "Generally, either 'party aggrieved' by the findings of the SRO 'shall have the right to bring a civil action' in either state or federal court. *Id.* (quoting 20 U.S.C. § 1415(i)(2)(A)).

Claims for tuition reimbursement "are governed by the *Burlington/ Carter* Test, which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."[1] *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014); *see also M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013). Under New York law, "the local school board bears the initial burden of establishing the validity of its plan at a due process hearing." *R.E. v. New York City Dep't*

---

[1] The *Burlington/Carter* test takes its name from two landmark Supreme Court cases: *Sch. Comm. of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985) ("*Burlington*"); *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993) ("*Carter*").

*of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012) (citing N.Y. Educ. Law § 4404(1)(c)). "If the board fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *Id.* at 185.

## II.    Factual Background

During the 2022-2023 school year, E.B. attended PS-340 as a general education student in an Integrated Co-Teaching ("ICT") classroom for second grade.[2] (R.[3] 183.) Beginning in November 2022, the Parents had E.B. evaluated by pediatric neuropsychologist Dr. David Salsberg. (R. 105.) Dr. Salsberg evaluated E.B. over four dates ending on January 4, 2023. (*Id.*) Dr. Salsberg diagnosed E.B. with dyslexia and recommended that E.B. be placed as a special education student in an ICT classroom and that she also receive small group instruction with an experienced Orton-Gillingham[4] ("OG") trained provider or Special Education Teacher Support Services ("SETSS") on a daily basis to target her language-based skill development. (R. 118.) Dr. Salsberg indicated that, if it was too disruptive for E.B. to receive SETSS during the school day, consideration of a Related Services Authorization was recommended with an experienced OG-trained provider to target her reading and writing development outside of school at a rate and frequency determined by the provider. (*Id.*) Dr. Salsberg further recommended that E.B. participate in school-based counseling and receive accommodations, including extended time on

---

[2] "An ICT classroom is made up of both disabled and non-disabled students taught by a general education teacher and a special education teacher, and includes no more than twelve students with disabilities." *S.W. v. New York Dep't of Educ.*, 92 F. Supp. 3d 143, 150 (S.D.N.Y. 2015) (citing 8 N.Y.C.R.R. § 200.6(g)); *see also M.W. ex rel. S.W.*, 725 F.3d at 144-45 (describing ICT classes).

[3] The Certified Administrative Record ("R.") is filed at ECF No. 23.

[4] "Orton-Gillingham is a specialized, multisensory teaching method designed to educate students with dyslexia and other learning disabilities." *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 384 n.12 (S.D.N.Y. 2006); *see also L.J.B. v. N. Rockland Cent. Sch. Dist.*, 660 F. Supp. 3d 235, 251 n.11 (S.D.N.Y. 2023).

assignments. (R. 118-19.)

Following receipt of Dr. Salsberg's evaluation, the Parents requested an initial IEP meeting and provided the District with a copy of the evaluation report. (R. 9.) On January 6, 2023, the District conducted a social history evaluation. (R. 203.) The District conducted a classroom observation of E.B. on February 2, 2023. (R. 208.) On February 14, 2023 the Distrct notified the Parents that a CSE meeting has been scheduled for March 1, 2023. (R. 209-11.) Sometime in February 2023, the Parents began providing E.B. with OG tutoring outside of school two times per week for 60 minutes. (R. 183.)

The March 1, 2023 CSE meeting was attended by E.B.'s mother, the general education teacher and special education teacher from E.B.'s second-grade class and the school psychologist who served as District Representative. (R. 229-31; *see also* R. 136.) The CSE determined that E.B. had a learning disability and developed an IEP to be implemented on March 6, 2023. (R. 212.) The March 2023 IEP recommended placing E.B. in a 10-month school year program as a special education student in an ICT classroom, as well as school-based counseling services to support emotional awareness and development of adaptive coping skills. (R. 215.) On March 7, 2023, the District emailed M.B. a Prior Written Notice of the placement and recommended special education services. (R. 247.) On March 9, 2023, M.B. executed the consent form for the provision of the services recommended in the IEP. (R. 232.)

On May 12, 2023, M.B. signed an enrollment contract for E.B. to attend The Winward School ("Winward") for the 2023-2024 school year. (R. 141-44.) In accordance with the contract, the Parents became obligated to pay the total cost of tuition at Windward on July 1, 2023. (R. 141.)

On June 12, 2023, M.B. emailed the school psychologist indicating that the Parents decided E.B. would receive outside counseling from a private psychologist and no longer needed counseling in school. (R. 247.) On June 16, 2023, the District issued a Reconvene Notice to revise E.B.'s IEP to remove school-based counseling and mailed a copy of a Prior Written Notice reflecting the change to E.B.'s IEP. (R. 248-55.) The June 2023 IEP otherwise remained unchanged from the March 2023 IEP.[5]

On June 27, 2023, M.B. emailed the school Principal indicating that E.B. had been re-evaluated by Dr. Salsberg the previous week and that they would submit the report when it was prepared. (R. 136.) M.B. wrote that, when the Parents spoke with Dr. Salsberg, he felt strongly that E.B. should be placed in a full-time special education program for bright students with dyslexia and other language-based learning disabilities and that E.B. needed a program with an evidence based multi-sensory approach. (R. 136-37.) M.B. also wrote that, if any public schools would have this program, to please let the Parents know. (R. 137.) The Principal responded on July 6, 2023 stating that E.B.'s IEP needed "to be opened as a reconvene team so that the IEP team [could] review Dr. Salsberg's evaluation report and make appropriate recommendations" and that she was copying the Supervisor of Psychologists who would contact M.B. to start the process. (*Id.*)

On August 15, 2023, the Parents, through their counsel, sent the District a Notice of Unilateral Placement, indicating that they intended to place E.B. at Winward for the 2023-2024

---

[5] As the IHO explained, the only IEP in the record is dated March 1, 2023, but includes reference to the Parents' June 12, 2023 request to remove school-based counseling services and, thus, appears to be an updated version of E.B.'s IEP. (R. 33; *see also* R. 229, 231.) The Court, as did the SRO, refers to the IEP as the June 2023 for consistency. (R. 9 n.2.) There is no dispute, however, the substance of the IEP relevant to the Parents' challenges was developed in March 2023. (*See* R. 51 n.5.)

school year. (R. 102-03.) The Notice stated that the Parents rejected the IEP proposed by the CSE at the last IEP meeting, as well as the program recommended in the March IEP. (*See id.*) E.B. began attending Winward on September 11, 2023. (R. 145.)

### III.   Administrative Proceedings

The Parents filed a Due Process Complaint on January 8, 2024, seeking reimbursement for E.B.'s placement at Winward for the 2023-2024 school year. (R. 97-100.) The District provided a copy of the June 16, 2023 Prior Written Notice as its response. (R. 267, 285-86.)

#### A.   IHO Hearing And Decision

After two initial appearances, a hearing was held before IHO Olivia Sohmer on April 10, 2024. (R. 10, 283-384.) On June 24, 2024, the IHO issued a decision finding that the District offered E.B. a FAPE for the 2023-2024 school year, and that equitable considerations weighed against the Parents, and denied the Parents' requested relief. (R. 26-39.) The IHO determined that the IEP itself contained ample articulation of the CSE's rational for its recommendations, which further were supported by other documents in the hearing record, including Dr. Salsberg's evaluation and that the March IEP and June update to the IEP provided E.B. with a FAPE. (R. 32-33.) The IHO also found that the District was not obligated to reconvene before receiving any new material. (R. 33.) The IHO emphasized that the Parents never provided Dr. Salsberg's updated evaluation and also did not inform the District regarding the private tutoring E.B. received or ask the District to reconsider the IEP on the ground that such outside supports were ineffectual. (R. 33, 35.) Accordingly, in addition to finding in favor of the District on the first prong of the *Burlington/Carter* analysis, the IHO also found that the equities did not favor the Parents

because they did not share relevant information and the ten-day notice was too late for the District to take any action to forestall the unilateral placement. (R. 34-35.)

### B.      SRO Review

The Parents appealed the IHO's decision to the SRO. (R. 44-58.) As discussed in further detail below, the SRO issued a decision on October 7, 2024, finding that the record evidence supported the IHO's determination that the District offered E.B. a FAPE for the 2023-2024 school year and declining to address the two remaining prongs. (R. 7-19.)

### IV.     Procedural History

The Parents filed the Complaint in this action on February 6, 2025. (*See* Compl.) On August 29, 2025, Plaintiffs filed their motion for summary judgment (*see* Pls.' Mot.), along with the Certified Administrative Record. Defendant filed its cross-motion for summary judgment and opposition to Plaintiffs' motion on December 1, 2025. (*See* Def.'s Mot.) On January 5, 2026, Plaintiffs filed their reply memorandum in support of their motion and opposition to Defendant's motion. (Pls.' Opp. Mem., ECF No. 32.) On January 20, 2026, Defendant filed its reply memorandum in support of its cross-motion. (Def.'s Reply, ECF No. 33.)

### LEGAL STANDARDS

### I.      Summary Judgment In The IDEA Context

"When [an action for review of an SRO decision] is brought in federal district court, the court reviews the records of all of the prior administrative hearings and must hear additional evidence if so requested by either of the parties." *M.H.*, 685 F.3d at 225 (citing 20 U.S.C § 1415(i)(2)(c)). "The court typically considers the propriety of the IEP on the parties' cross motions for summary judgment." *Id.* "However, 'a motion for summary judgment in an IDEA case

often triggers more than an inquiry into possible disputed issues of fact.'" *Id.* (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.,* 397 F.3d 77, 83 n. 3 (2d Cir.2005)). Thus, "the usual summary judgment standards do not apply." *Cornett v. Banks*, No. 23-CV-06893 (MMG), 2025 WL 712799, at *3 (S.D.N.Y. Mar. 5, 2025). "Rather, summary judgment in an IDEA case functions as an appeal from an administrative decision." *S.M.,* 2026 WL 396110, at *7 (citing *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009)). "[T]he motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." *M.H.*, 685 F.3d at 225-26 (citing *Lillbask,* 397 F.3d at 83). "Though the parties in an IDEA action may call the procedure a motion for summary judgment, the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." *Id.* at 226 (cleaned up). "[B]asing its decision on the preponderance of the evidence, [the court is required to] grant such relief as the court determines is appropriate." *Id.* (citing § 1415(i)(2)(C)(iii)).

## II.    Standard Of Review

"The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers." *M.H.*, 685 F.3d at 240. "Their rulings are then subject to 'independent' judicial review." *Id.* (quoting *Walczak v. Florida Union Free School Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)). Nonetheless, "[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *C.F. ex rel. R.F.*, 746 F.3d at 77. "This review requires a more critical

appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *M.W. ex rel. S.W.*, 725 F.3d at 138 (cleaned up).

"While the district court must base its decision on the preponderance of the evidence, 20 U.S.C. § 1415(i)(2)(C)(iii), it must give due weight to [the administrative] proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy[.]" *A.C. ex rel. M.C.*, 553 F.3d at 171 (cleaned up). "Thus, district courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Rowley,* 458 U.S. at 206). "District courts are not to make subjective credibility assessments and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *M.H.*, 685 F.3d at 240 (cleaned up); *see also W.A.*, 927 F.3d at 149 ("[R]ather than credit the conclusions that were most consistent with its own subjective analysis, the reviewing court should only reject the SRO's conclusions if it finds that they are not supported by a preponderance of the evidence.") (cleaned up).

"The deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F. ex rel. R.F.,* 746 F.3d at 77. "Deference is particularly appropriate when the state hearing officers' review has been thorough and careful[,]" *M.H.*, 685 F.3d at 240, and "when the SRO agreed with the IHO's ruling." *J.D. v. Rye Neck Union Free Sch. Dist.*, No. 22-CV-03039 (VB), 2023 WL 1797170, at *9 (S.D.N.Y. Feb. 7, 2023). "However, 'deference is not warranted' on 'issues of law, such as the proper interpretation of the federal statute and its requirements.'" *Thomason v. Banks*, No. 25-475, 2026 WL 201127 (2d Cir. Jan. 27, 2026) (quoting

10

*Lillbask*, 397 F.3d at 82). "Accordingly, the agency's rulings on questions of procedure are afforded less deference than its determinations regarding educational policy." *Id.* (citing *M.H.*, 685 F.3d at 244-46). The party appealing an SRO's decision to the federal level bears the burden of proof in establishing that the decision is not entitled to deference by "calling [a court's] attention to an SRO's specific errors in law, fact, or reasoning*." M.W. ex rel. S.W.,* 725 F.3d at 139.

**DISCUSSION**

I.      **Prong I: Whether The District Offered E.B. A FAPE For The 2023-2024 School Year**

"In addressing the first prong of the *Burlington*/*Carter* test—whether the school district offered the student an appropriate program—a court looks at two factors: (1) whether the student's IEP was developed according to the IDEA's procedural requirements and (2) whether the educational plan set forth in the IEP was reasonably calculated to confer educational benefit on the student." *Cornett*, 2025 WL 712799, at *4 (citing *Walczak*, 142 F.3d at 129). "Procedural violations warrant tuition reimbursement only if they impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process, or caused a deprivation of educational benefits." *M.W. ex rel. S.W.*, 725 F.3d at 139 (cleaned up).

Courts examine the substantive adequacy of an IEP to determine whether the IEP is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id*. (emphasis in original). The District is "required to provide only a basic floor of opportunity; it need not furnish every special service necessary to maximize each handicapped child's potential." *J.S. v. New York City Dep't of Educ.,* 104 F. Supp.

3d 392, 410 (S.D.N.Y. 2015) (cleaned up) (quoting *M.H.,* 685 F.3d at 224, 243), *aff'd,* 648 F. App'x 96 (2d Cir. 2016)); *see also J.R. v. N.Y.C. Dep't of Educ.*, 748 F. App'x 382, 386 (2d Cir. 2018) (quoting *Walczak*, 142 F.3d at 132) ("IDEA requires an appropriate education, not one that provides 'everything that might be thought desirable by loving parents.'"). Moreover, the Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned[.]" *R.E.,* 694 F.3d at 189.

### A.    Burden Of Proof And Sufficiency Of Documentary Evidence

The Parents first argue that the Court should overturn the SRO's decision that the District carried its burden to prove the substantive adequacy of the June 2023 IEP. (Pls.' Mem., ECF No. 25, at 9-12.) The Parents contend that the District did not meet its burden because it failed to disclose all the data the CSE relied upon in formulating the IEP and failed to produce a witness to testify regarding: (1) its recommendation of an ICT classroom without daily small group instruction with an OG provider or SETSS and (2) the reasoning behind the goals and management needs selected for E.B. (*Id.*) Defendant responds that the SRO's decision was thorough and well-reasoned, and thus entitled to deference, and that the SRO correctly found that the District provided E.B. with a FAPE for the 2023-2024 school year. (Def.'s Mem., ECF No. 31, at 15-19.)

In finding that the District met its burden of proof, the SRO correctly explained that, while the District was not required to call a witness, it was required to defend its recommendations and provide evidence that explained such recommendations.[6] (R. 17; *see also Endrew F.*, 580 U.S.

---

[6] Although the Parents assert that they are unaware of any case in which a school district was found to have met its burden of proof to demonstrate that a FAPE was provided in the absence of witness testimony (Pls.' Mem. at 12 n.7), the Court's review of SRO decisions reveals that it is not uncommon for school districts to rely on documentary evidence without witness testimony. *See, e.g.*, *Application of a s Student With a Disability*, Appeal No. 24-484, New York State Educ. Dep't Off. of State Rev. (Feb. 25, 2025),

at 404.) With respect to the documentary evidence relied upon by the District, the SRO set forth the evidence introduced by the District, including the June 2023 IEP, the prior written notices, a social history evaluation and classroom operations. (*Id.*) The SRO noted that reports of the privately obtained neuropsychological evaluation and psychoeducational assessment, which the CSE also considered, were absent from the District's presentation, but the Parents had introduced the neuropsychologist's report. (*Id.*) The SRO concluded that, despite gaps in its presentation, the District met its burden of proof and that, contrary to the Parents' contention, the March 7, 2023 Prior Written Notice explicitly stated which materials the CSE used to develop the IEP and that the IEP itself contained "sufficient information to enable a fact-specific analysis of the parents' particular challenges to its substantive adequacy." (*See id.*)

The Court finds no basis to disturb the SRO's determination that the District relied upon sufficient evidence regarding the adequacy of the IEP. *See F.B. v. New York City Dep't of Educ.*, 923 F. Supp. 2d 570, 581-82 (S.D.N.Y. 2013) ("[The IDEA] does not require that the team review every single item of data available, nor has case law interpreted it to mean such."). The Parents argue that the SRO's decision was not well reasoned because he referred to the psychoeducational assessment without acknowledging that there are no details from the assessment in the IEP. (Pls.' Opp. Mem. at 6.) However, the psychoeducational assessment that the Parents contend was not disclosed appears to refer to components of Dr. Salsberg's

---

available at https://perma.cc/QZA5-9GS9 ("To be clear, there is no procedural requirement that a district call witnesses at the impartial hearing in order to address the parent's due process complaint notice, especially if the district submits the extensive documentation that is required under the procedures of the IDEA itself.") (rejecting "bright line rule" requiring witness testimony); *Application of a s Student With a Disability*, Appeal No. 24-511 New York State Educ. Dep't Off. of State Rev. (Jan. 22, 2025), *available at* https://perma.cc/3XSK-B6QB (school district's presentation of documentary evidence sufficient to sustain burden of proof).

neuropsychological evaluation, which was presented at the hearing by the Parents.[7] (*See* R. 11 ("Reports of the privately obtained neuropsychological evaluation and the psychoeducational assessment, which the CSE also used in developing the student's IEP, were absent from the district's presentation, although the parents presented the private neuropsychologists report[.]").) To the extent there was a separate assessment, the Parents do not identify any information that was not reflected in the materials considered by the CSE. *See F.B.*, 923 F. Supp. 2d at 581-82 (IEP based upon sufficient evaluative data when, even if psychoeducational update not considered, parents did not identify "any facts or reasoning in it that were not also reflected in the other, substantial materials considered" by CSE).

The Parents also argue that, to the extent the CSE relied upon the psychoeducational assessment, its absence from the IEP itself, compounded by the District's failure to produce the document or witness testimony regarding how it was used, was "a serious violation of the procedures of the IDEA." (Pls.' Opp. Mem. at 6-7 (quoting *L.O. v. New York City Dep't of Educ.*, 822 F.3d 95, 110-11 (2d Cir. 2016)).) However, the SRO did not assume that the CSE relied upon a psychoeducational report not in the record. Unlike in *L.O.*, there was evidence in the record regarding the materials upon which the CSE relied, which included the evaluation by Dr. Salsberg. *Cf. L.O.*, 822 F.3d at 109-10 (finding procedural error when district did not show which evaluative information was reviewed during CSE meetings and there was no evidence that any of student's

---

[7] "When achievement testing is undertaken along with intellectual and processing testing, the overall evaluation is commonly referred to as a psychoeducational assessment." Wilkins Kaplan & Sadock's Comprehensive Textbook on Psychiatry, 10th Ed. CH36 (WL Ser. No. LWWPSY10TH CH36). Dr. Salsberg's evaluation included a variety of such tests, including the Wechsler Test of Intelligence for Children, Fourth Edition (WISC-IV), which is a psychoeducational assessment test for children. *See M.P. v. Santa Monica Malibu Unified Sch. Dist.*, 633 F. Supp. 2d 1089, 1092 n.4 (C.D. Cal. 2008).

evaluations were reviewed by CSE); *see also M.E. v. New York City Dep't of Educ.*, 22-CV-09642 (CM), 2024 WL 1514299, at *9 (S.D.N.Y. Apr. 8, 2024) (rejecting similar argument when SRO did not assume what CSE must have reviewed but rather relied upon evidence in record indicating what materials were reviewed). Moreover, because the CSE considered sufficient other information, including the results of numerous tests set forth in Dr. Salsberg's evaluation, the Court finds that any procedural violation did not render the IEP legally inadequate. *See Killoran v. Westhampton Beach UFSD*, 21-2647, 2023 WL 4503151, at *2 (2d Cir. July 13, 2023) (procedural error "did not deprive [student] of a FAPE because the CSE considered other information sufficient to understand [the student]'s educational needs").

### B.  Placement In ICT Classroom Without Daily Small Group Instruction With An OG Provider Or SETSS

Plaintiffs contend that the SRO erred in finding that the District carried its burden to show that E.B.'s placement in an ICT classroom, without daily small group instruction with an OG provider or SETSS to target E.B.'s language-based skill development, was reasonably calculated to enable E.B. to make progress appropriate in light of the E.B.'s circumstances and, thus, provided E.B. with a FAPE. (Pls.' Mem. at 12.) Defendant responds that the SRO correctly concluded that the IEP provided a FAPE despite not recommending OG based tutoring or SETSS. (Def.'s Mem. at 18-19.)

Prior to considering the appropriateness of the CSE's recommendation, the SRO discussed in detail the evidence regarding E.B.'s needs. (R. 18-19.) The SRO noted that private testing by

Dr. Salsberg yielded varied results.[8] (R. 18.) The SRO found that E.B.'s needs at the time of the March and June 2023 CSE meetings, including results of Dr. Salsberg's findings, were identified in the present levels of performance section of the June 2023 IEP. (*Id.* (citing R. 212-216).) With respect to reading skills, the SRO noted that the IEP indicated that E.B. had moved up four reading levels since beginning second grade but was below grade level and struggled with independence related to decoding unknown words. (R. 18-19 (citing R. 213).) The SRO found that the June 2023 IEP showed that the CSE considered information from E.B.'s teachers and parents, as well as the results of District and private testing, and, in conjunction with management strategies and goals, recommended that E.B. receive 10 period per week of ICT services in English Language Arts, in addition to ICT services in other subjects. (R. 22.) The Court finds that the SRO's decision is thorough and entitled to deference, particularly because it relates to matters of education policy and is based on the same evidence now before the Court. *See M.H.,* 685 F.3d at 244.

The SRO rejected the Parents' argument that that IHO erred by ignoring Dr. Salsberg's recommendations regarding an OG provider or SETSS, explaining that, while the CSE must consider independent evaluations, consideration does not require substantive discussion or that the CSE afford the private evaluation of any particular weight or adopt its recommendations. (R. 23.) The SRO also rejected the Parents' argument that further support was required because, even with private tutoring outside of school, ICT services failed to enable E.B. to function at grade level and make progress. (R. 24.) The SRO discussed Dr. Salsberg's report, which specifically stated that, at the time of the report, no special education supports had been given. (R. 24 n.10.)

---

[8] The private testing discussed in Dr. Salsberg's evaluation report included the Wechsler Individual Achievement Test, Fourth Edition (WIAT-4), the Kaufman Test of Educational Achievement, Third Edition (KTEA-3) and the Gray Oral Reading Tests, Fifth Edition (GORT-5). (R. 111.)

The SRO explained that there was no evidence in the hearing regarding E.B.'s progress as a general education student in the ICT classroom from the prior school year, such as report cards or progress notes, and, even if E.B. had benefited from the ICT program prior to March 2023, E.B. only had been receiving special education support throughout the school day for approximately four months. (R. 24-25.)

The Parents contend that the SRO should have faulted the District for the lack of evidence regarding E.B.'s progress in the ICT classroom prior to the implementation of the March 2023 IEP and that, absent such evidence, the District's recommendation "of the same ICT placement" without the additional support recommended by Dr. Salsberg constitutes the denial of a FAPE. (Pls.' Mem. at 12-14.) Although E.B. coincidentally had been placed in an ICT classroom as a general education student since first grade, no special education supports had been given prior to March 2023. (*See* R. 105-06.) Thus, the SRO properly rejected the claim that the ICT services in the IEP were not enabling E.B. to progress, explaining that E.B. only had received special education supports throughout the school day from about March 2023 through about June 2023. (R. 25.) Moreover, as the SRO also discussed, the June 2023 IEP indicated that E.B. was making progress on annual goals with respect to reading, including regarding decoding words. (R. 21; *see also* R. 218.)

The SRO properly determined that, while the CSE must consider independent evaluations, consideration does not require substantive discussion or that the CSE afford the private evaluation of any particular weight or adopt its recommendations. (R. 23 (citing *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 753 (2d Cir. 2018); *Watson v. Kingston City Sch. Dist.*, 325 F.

Supp. 2d 141, 145 (N.D.N.Y. 2004).[9]) Contrary to the Parents' argument, the Court finds that there was no "clear consensus" that daily small group instruction with an OG provider or SETSS support was required in addition to the ICT services, supports and accommodations set forth in the IEP. (Pls. Mem. at 14-16.) To begin with, as the SRO explained, SETSS is not defined in the state regulations, and the precise meaning can vary by context.[10] (R. 23 n.9.) Dr. Salsberg recommended small group instruction in addition to E.B.'s placement in an ICT setting, but the ICT setting he envisioned encompassed services E.B. received as a general education student in the ICT classroom. (R. 118.) Moreover, although Dr. Salsberg recommended that daily services be provided, he also indicated that, if SETSS was too disruptive, outside services at a lesser frequency may be sufficient. (*Id.*) Thus, the record does not reveal a clear consensus that SETSS or daily OG instruction was required in addition to the ICT services set forth in the IEP.

The Court also finds that there was no clear consensus that E.B. required instruction with an OG-trained provider. Although Dr. Salsberg recommended services with an OG trained provider, his report also referred to specialized, multi-sensory reading interventions, of which OG

---

[9] *See also H.A.L. v. New York City Dep't of Educ.*, 24-CV-06879 (KPF), 2026 WL 683382, at *14 (S.D.N.Y. Mar. 11, 2026) ("The mere fact that a separately hired expert has recommended different programming does nothing to change the deference to the school district and its trained educators.") (cleaned up); *C.H. v. Goshen Cent. Sch. Dist.*, 11-CV-06933 (CS), 2013 WL 1285387, at *15 (S.D.N.Y. Mar. 28, 2013) ("More fundamentally, the law does not require an IEP to adopt the particular recommendation of an expert; it only requires that that recommendation be considered in developing the IEP.") (collecting cases); *Application of a Student with a Disability*, Appeal No. 24-158, New York State Educ. Dep't Off. of State Rev. (Jul. 3, 2024), *available at* https://perma.cc/TFR7-C87K ("District staff responsible for formulating the student's IEP in compliance with the requirements of the IDEA may be afforded some deference over the views of private experts.").

[10] For example, the DOE website refers to direct or indirect SETSS, both of which appear targeted to students who otherwise are in general education classrooms without a special education teacher. *See* Special Education School Settings District Schools, N.Y.C. Pub. Schs., *available at* https://perma.cc/YE4L-UCDS.

was one example. (R. 119.) At the IEP meeting, E.B.'s mother raised the issue of "dyslexia support[,]" not OG instruction in particular, and there is no evidence that OG instruction was discussed by the CSE.[11] (R. 184.) Thus, the evidence does not support the conclusion that OG was the only methodology that would enable E.B. to receive an educational benefit. *Cf. R.E.*, 694 F.3d at 194 (finding an IEP substantively inadequate where there was "clear consensus" that a student required a particular methodology, but where the "plan proposed in [the student's] IEP" offered "no guarantee" of the use of this methodology).

While not recommending services with an OG provider or SETSS, in concluding that the IEP offered E.B. a FAPE, the SRO found that the content of the June 2023 IEP nevertheless closely aligned with Dr. Salsberg's findings and recommendations that were available to the CSE. (R. 24.) A review of the record supports the SRO's determination. The IEP indicated that E.B. would benefit from small groups and working 1-1 with teacher support with a multi-disciplinary approach to reading to target language based skill development. (R. 214.) In particular, the IEP stated that E.B. may need help with visual scanning and attention to make sure E.B. did not skip words or lines and, as basic skills were developed, focus needed to be given to comprehension skills. (*Id.*) This recommendation was one of the specific strategies for fluency included in Dr. Salsberg's report. (R. 120.) The IEP further stated that cues and prompts were important to help E.B. direct attention appropriately and examine tasks and materials closely, as well as check for understanding. (*Id.*) The IEP also indicated that teachers and providers working with E.B. should

---

[11] Accordingly, the Court finds no merit in the Parents' argument that the District's failure to consider OG or SETSS "per the Parents' request" constituted a procedural violation of the IDEA. (Pls.' Mem. at 16 n.9.) As discussed by the SRO, the CSE considered the results of Dr. Salsberg's evaluation and the concerns of the Parents in developing the IEP. (R. 23.)

19

utilize hands-on or interactive activities, when possible, to engage E.B. in the task at hand, and that E.B. also benefited from repeated practice and extra positive reinforcement. (*Id.*) Each of these recommendations reflected Dr. Salsberg's recommendations for addressing E.B.'s attentional vulnerabilities. (R. 121.)

Although the June 2023 IEP may not have provided all the supports that the Parents ideally would have wanted, the IDEA does not require what is best, but only "what is good enough for the student to make reasonable progress." *See C.H.*, 2013 WL 1285387, at *15 (citing *M.H.*, 685 F.3d at 245). The Court defers the SRO's determination that ICT services set forth in the IEP, along with other accommodations, which E.B. had not been receiving prior to March 2023, were reasonably calculated to enable E.B. to make appropriate progress. *See C.S. v. Yorktown Cent. Sch. Dist.,* No. 16-CV-09950 (KMK), 2018 WL 1627262, at *16 (S.D.N.Y. Mar. 30, 2018) (deference "particularly appropriate" where SRO also reviewed IEP's recommendations and concluded they were reasonably calculated to address students' speech-language needs); *A.L. on behalf of C.L. v. New York City Dep't of Educ.*, No. 16-CV-02827 (AJN), 2017 WL 11697978, at *10 (S.D.N.Y. July 11, 2017) ("The question of whether ICT services were adequate to address [the student's] special needs is exactly the type of educational policy decision to which this Court must defer."); *W.W. v. New York City Dep't of Educ.,* No. 12-CV-07196 (AT) (HBP), 2014 WL 1330113, at *14 (S.D.N.Y. Mar. 31, 2014) ("Whether an education program such as SETSS or ICT is appropriate for a particular student is a question best left to the educational authorities."). The SRO's determination with respect to ICT services is therefore affirmed.

### C.      Management Needs And Annual Goals

The Parents also argue that the District failed to carry its burden to demonstrate the appropriateness of the management needs and the goals on the 2023 IEP resulting in the substantive denial of a FAPE. (Pls.' Mem. at 16-17.) The Parents first contend that the District failed to disclose all the materials it considered in developing the management needs and goals and the SRO's determination was not connected to the full scope of the evaluative information available to the District at the time of the March 2023 IEP meeting. (Pls.' Mem. at 16, 18.) The SRO found that, "[c]ontrary to the parents' contention, the June 2023 IEP indicated that the CSE developed the student's management needs directly from [E.B's] levels of performance and academic functioning, parent input, as well as the results of the neuropsychological evaluation." (R. 20.) As set forth above, the Court finds no basis to disturb the SRO's determination that the District relied upon sufficient evidence regarding the adequacy of the IEP, including with respect to management needs and goals. The Parents' speculation that there might have been additional information included on "missing documents" (Pls.' Mem. at 17) is not sufficient to call into question the SRO's determination.

The Parents also argue that the SRO's analysis that management needs aligned with E.B.'s needs was not well reasoned because he improperly credited the District with mandating management needs that only were discussed in the "Academic Achievement, Functional Performance and Learning Characteristics" section of the IEP. (Pls.' Mem. at 17-18.) Rather than exalt form over function, the Parents assert that this is significant because there is no requirement that the District implement that section of the IEP and, thus, they had no guarantee that those supports would continue in the 2023-2024 school year. (Pls.' Mem. at 18 n.12.)

As set forth by the SRO, state regulations define management needs as "the nature of and degree to which environmental modifications and human or material resources are required to enable the student to benefit from instruction" and shall be determined in accordance with the factors identified in the areas of academic or educational achievement and learning characteristics, social and physical development. (R. 19-20 (citing 8 NYCRR § 200.1(ww)(3)(i).) Although the SRO discussed other sections of the IEP in identifying E.B.'s academic needs, he did not confuse those needs with the management needs set forth in the IEP, as the Parents now suggest. Rather, the SRO properly determined that the management needs set forth in the IEP were consistent with Dr. Salsberg's report and aligned with E.B.'s academic, developmental and functional needs as reflected in the IEP, including the recognition that E.B. benefits from small groups and working 1:1 with teacher support. (R. 20.) The Court defers to the SRO's well-reasoned determination that the management needs recommended in the IEP aligned with E.B.'s needs.

The Parents further argue that the SRO improperly concluded that the District developed sufficient goals to address E.B.'s needs. (Pls.' Mem. at 18.) As set forth by the SRO, the IDEA requires that an IEP include a statement of measurable annual goals, including academic and functional goals, designed to meet the student's needs that result from the student's disability to enable the child to be involved in and make progress in the general education curriculum; and meet each of the student's other educational needs that result from the student's disability. (R. 20-21 (citing 20 U.S.C. § 1414(d)(1)(A)(i)). The SRO considered the six goals set forth in the IEP and determined that they addressed E.B.'s needs consistent with the neuropsychological evaluation recommendations and that the Parents had not identified any needs that went

unaddressed. (R. 21-22.) With respect to goals regarding reading comprehension, for example, the SRO noted that the goals were designed for E.B. to improve sight words and decoding skills. (R. 21.)

The Parents point out that the IEP included an annual goal that E.B. appears to have achieved before the IEP was developed. (Pls.' Mem. at 18-20; Pls.' Opp. Mem. at 7.) The SRO recognized that two of the goals had been met in the first progress reporting period. (R. 21.) The fact that E.B. was making progress on certain goals did not render the goals inadequate at the time they were implemented. In any event, "[t]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers[,]" *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 382 (2d. Cir. 2003), and the Parents have not demonstrated that any alleged deficiency with respect to one goal resulted in the denial of a FAPE. *See Z.D. v. Niskayuna Cent. Sch. Dist.,* No. 06-CV-01190 (FJS) (DRH), 2009 WL 1748794, at *3 (N.D.N.Y. June 19, 2009) (finding that parents failed to demonstrate that any alleged deficiencies with respect to goals resulted in denial of FAPE).

For the reasons set forth above, affording due weight to the SRO Decision, and based on the Court's independent examination of the record, the Court affirms the SRO's determination that the District offered E.B. a FAPE for the 2023-2024 school year.

### D.    Failure To Reconvene IEP Meeting In Summer 2023

The Parents further argue that the District's failure to reconvene an IEP meeting during the summer of 2023 was a procedural violation that rises to the level of a substantive denial of a FAPE. (Pls.' Mem. at 19-22.) The Parents contend that M.B.'s June 27, 2023 email to the school Principal obligated the District to either reconvene an IEP meeting or provide written notice of

23

its refusal to do so. (*Id*. at 19-21.) Defendant argues that the SRO correctly found that the DOE was not obligated to reconvene the CSE for an IEP meeting in summer 2023 "based on the report created by the neurologist" (Def.'s Mem. at 19-20), and that neither the current statute nor regulations required the District to conduct a new IEP meeting or provide written notice of its refusal to do so in response to the Parents' request. (Def.'s Reply at 5-6.)

The IDEA requires the CSE to "review[ ] the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved," and to "revise[] the IEP as appropriate to address" any lack of expected progress, the result of any reevaluation, new information from the parents, or other matters. 20 U.S.C. § 1414(d)(4)(A); *see also* 34 C.F.R. § 300.324. State regulations additionally provide that, if parents believe that their child's placement is no longer appropriate, they "may refer the student to the [CSE] for review." 8 NYCRR § 200.4(e)(4).

Although the Federal Register cited by the Parents refers to regulations codified at 30 C.F.R. § 300.343, which were in effect through October 12, 2006, *see* 64 Fed. Reg. 12476, the relevant regulatory language regarding review and revision of IEPs appears to have remained the same. *Compare* 34 C.F.R. § 300.343(c) with § 300.324(b)(1); *see also M.N. on behalf of EN v. Katonah Lewisboro Sch. Dist.*, No. 19-CV-06793 (CS), 2020 WL 7496435, at *13 n.20 (S.D.N.Y. Dec. 21, 2020). Moreover, the Federal Register elsewhere makes clear that the requirement that a district provide written notice of its refusal to conduct an IEP meeting stems from the still-current requirement in § 300.503 that a district provide prior written notice whenever it refuses to change the educational placement of a child or the provision of a FAPE to a child. *See* 64 Fed. Reg. 12581 (rejecting suggestion that § 300.343 should include provision to clarify that public

24

agencies will honor "reasonable" requests by parents for meeting to review child's IEP given agency option to refuse request "consistent with the prior notice requirements in § 300.503" and inform parents of right to pursue due process hearing). Indeed, the SRO did not find that the District had no obligation to respond to a request by the Parents, as the District now appears to contend,[12] but rather that neither the June 26, 2023 email nor the August 2023 Ten-Day Notice was sufficient to trigger the District's obligation. (*See* R. 14, 15-16.)

The SRO found that the evidence in the hearing record did not indicate that the District was obligated to reconvene the CSE for an IEP meeting in summer 2023 because there was "no evidence that the [D]istrict received an affirmative request to reconvene the CSE to revise [E.B.'s] IEP based on new information or new evaluative information for the CSE's consideration." (R. 14.) The SRO considered the June 27, 2023 email from E.B.'s mother to the school principal, in which she mentioned that E.B. had been reevaluated by Dr. Salsberg and expressed interest in a different public school placement. (*Id.* (citing R. 136-37).) The SRO noted that it was the public school Principal who suggested the summer IEP team would need to re-open the IEP as a reconvene, but that the revaluation report "did not materialize over the summer." (*Id.*; *see also id.* n. 5.) The SRO found that there was no evidence in the record that the Parents ever shared a copy of the report with the District or even let the District know that the report had become available, even though it could be inferred based upon the date of the report (*i.e.*, August 19,

---

[12] In fact, the SRO cites to a guidance letter from the United States Department of Education Office of Special Education Programs indicating that parents may request a CSE meeting at any time and, if a district denies the parents' request, it must provide the parents with written notice of its refusal, including an explanation of why the district determine that conducting the meeting was not necessary to ensure the provision of a FAPE to the student. (R. 15 (citing *Letter to Anonymous*, 112 LRP 52263, Off. of Special Educ. and Rehab. Servs. (Mar. 7, 2012), *available at* https://perma.cc/LLE8-UJB4.)

2023), that the Parents obtained the report prior to the start of the 2023-2024 school year. (*Id.*; *see also id.* n.6.) The SRO also found that, absent an unambiguous request to reconvene, the District had no obligation to explain its refusal to do so. (R. 15-16 (distinguishing *Application of a Student with a Disability*, Appeal No. 15-099, New York State Educ. Dep't Off. of State Rev. (Dec. 21, 2015) (district violated IDEA by failing to either reconvene the CSE or provide a written notice explaining its refusal to do so in response to the parent's unambiguous request that the CSE reconvene), *available at* https://perma.cc/R4ZN-QFTT).)

The Court finds no basis to disturb the SRO's determination that the District was not required to reconvene the CSE for an IEP meeting based upon M.B.'s June 27, 2023 email. (R. 14-16.) The Parents contend that they were not required to use "magic words" to effectuate a proper request for a reconvene of an IEP meeting and that the email reflected "their belief that a change was necessary to E.B.'s educational placement." (Pls.' Mem. at 19-20; *see also* Pls.' Opp. Mem. at 8.) However, the email merely states that Dr. Salsberg told the parents after a reevaluation that E.B. needed a certain type of program and that, "if any public school will have this program[,]" to let them know how E.B. could be placed in such a class. (R. 137.) As discussed by the SRO, although E.B.'s mother expressed interest in a different public school placement consistent with Dr. Salberg's updated recommendations, the email did not request an IEP meeting and did not provide the updated report. (R. 14.) Thus, the SRO properly found that there was no basis for the CSE to reconvene.

Moreover, the SRO properly determined that any failure to reconvene based upon the Ten-Day Notice did not constitute denial of a FAPE because the Parents "declined to share the reevaluation report" and, therefore, "the district possessed no information likely to impact a

change in the CSE's recommendations prior to the start of the 2023-24 school year." (R. 16.) Thus, the Court affirms the SRO's determination that the CSE was not required to reconvene a CSE meeting in summer 2023 and, in any event, that any such failure did not constitute denial of a FAPE.

**III.    Remaining Prongs**

Because the Court concludes the SRO did not err in finding that the District offered E.B. a FAPE for the 2023-2024 school year, the Court need not, and does not, reach the questions of whether the Parents' enrollment of E.B. at Windward was appropriate or whether equitable considerations support their tuition reimbursement claim. *See J.D. v. Rye Neck Union Free Sch. Dist.,* No. 22-CV-03039 (VB), 2023 WL 1797170, at *14 (S.D.N.Y. Feb. 7, 2023) (citing *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED. The Clerk of Court is respectfully requested to enter judgment and close this case.

Dated:        March 26, 2026
              New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**

27